UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF NANA BARFI ADOMAKO, et al., | Case No. 17-cv-06386-DMR |
| Plaintiffs, | **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | Re: Dkt. No. 66 |
| CITY OF FREMONT, et al., | |
| Defendants. | |

This case arises out of the shooting death of Nana Barfi Adomako by City of Fremont police officer James Taylor on February 5, 2017. Plaintiffs are the Estate of Nana Barfi Adomako ("the Estate"); Augustina Yeboah, who is Adomako's mother and successor in interest to the Estate; and Nana N. Dwomoh, Adomako's brother and administrator of the Estate. Plaintiffs filed a civil rights action asserting constitutional violations pursuant to 42 U.S.C. § 1983 as well as related state law claims against the City of Fremont ("Fremont") and Taylor. Both Defendants now move for summary judgment. [Docket No. 66.] The court held a hearing on April 25, 2019. Following the hearing, the court ordered the parties to submit supplemental briefing regarding the Estate's negligence claim, which the parties timely filed. [Docket Nos. 74, 79, 80.] For the following reasons, the motion is granted in part and denied in part.

I.       **BACKGROUND**

    A.       **Factual Background**

The following facts are undisputed, unless otherwise noted. Taylor, a Fremont police officer, is a member of the K-9 unit. On February 5, 2017, Taylor was driving on patrol with Cairo, who had been his K-9 partner since August 2014. At some point after 4:00 p.m., dispatch sent two units to a Verizon store to respond to a report of a battery. At his deposition, Taylor

recounted his memory of the dispatch report as follows:

> I remember that the suspect had come in [to the Verizon store] and had bothered a customer and that an employee had asked him to leave. It progressed from there to that the employee told him he was going to call 911 and that at some point the suspect had approached and battered him and then had taken the phone from him, and that they gave a brief description and that he was last seen going westbound on Mowry passing the fire station.

Taylor Dep. 137-38.[1]  The dispatcher described the suspect as "a black male carrying a paper bag and wearing both a dark colored, black or blue jacket, and a green and brown sweatshirt and dark blue pants."  Taylor Decl., Mar. 10, 2019, ¶ 2.  Taylor was already in the area of the suspect's reported location and instructed the dispatcher to attach him to the service call.  *Id*. at ¶ 3.

As he drove westbound on Mowry, Taylor saw a man matching the suspect's description, later identified as Adomako, walking on the south side of the street.  *Id*. at ¶ 4; Taylor Dep. 133-34.  Taylor recognized Adomako from past interactions.  He testified that he believed that Adomako may have had problems with his mental health based on his overall demeanor, clothing, and incoherence during their conversations.  However, Taylor had never had a violent encounter with Adomako.  Taylor Dep. 149-51.

Taylor made a U-turn at the next intersection and traveled back eastbound on Mowry.  He then made a right turn onto the Mowry frontage road, intending to contact and detain Adomako to investigate the battery report.  After making the U-turn, Taylor activated the forward-facing red lights on top of his patrol car.  Taylor Dep. 134, 144; Taylor Decl. ¶ 5.

Taylor's car was equipped with a video recording system mounted near the rearview mirror and facing toward the front of the car.  It passively recorded video footage without audio, capturing events within its vantage point.  Taylor Decl. ¶ 6.  The record contains a copy of the video footage from Taylor's car, along with a slow-motion version that the Alameda County District Attorney's Office provided to Defendants.  Gaches Decl. ¶¶ 7-9, 10-12, Exs. B (Video), C

---

[1] Defendants submitted surveillance video from the Verizon store which showed Adomako's interaction with the Verizon employees.  [Docket No. 66-1 (Gaches Decl., Mar. 11, 2019) ¶¶ 4-6, Ex. A.]

United States District Court
Northern District of California

(Slow Motion Video). The video depicts Taylor making the U-turn on Mowry before turning right onto the frontage road and coming to a stop. Video :56-1:15.

The parties dispute Adomako and Taylor's initial movements after Taylor turned onto the frontage road. According to Taylor, as he turned onto the road, Adomako was approximately 50 to 60 feet away and was walking towards the car. Taylor Decl. ¶ 7. As he parked, Adomako was 15 to 20 feet away from the front of the car and was walking towards the driver's side. Taylor testified that he quickly got out of the car because he was concerned about being inside the car while Adomako approached it. Taylor Dep. 157-60; Taylor Decl. ¶ 8. As Taylor closed the car door, Adomako was standing in front of him. Taylor Decl. ¶ 8. However, according to Plaintiffs, Adomako was not walking towards Taylor. Witness Alan Arnold testified that Adomako was walking away from Taylor, and that Taylor motioned Adomako to come over to where Taylor was standing, apparently having already gotten out of the car. Arnold Dep. 23-24, 45. According to Arnold, Adomako did not initially comply; "he just was trying to walk away" in the opposite direction. *Id*. at 24. The record does not contain any details regarding Arnold's location or how far away he was from Adomako, Taylor, and the car. The video does not support Arnold's account. It does not depict Taylor, but it shows that Adomako walked in Taylor's direction facing the front of the car, as the car came to a stop with Taylor still inside. Adomako then appeared to veer to his right, in the direction of the driver's side door, before moving out of the video frame. Video 1:15-1:22.

The next 45 seconds of the encounter occurred outside the range of the video camera. Video 1:22-2:07. Taylor states that during this time, he got out of his car and attempted to engage Adomako in conversation. Taylor Dep. 160. According to Taylor, he said something like "Hey, I just need you to stop. I'd like you to have a seat" on the curb, to which Adomako responded, "Why are you stopping me? I am the king of Fremont. I am the chief of police." *Id*. at 161; Taylor Decl. ¶ 9. Taylor continued to ask him to sit down and Adomako continued to say, "Why are you stopping me?" and "I'm the chief of police." *Id*. at 165.

Taylor testified that Adomako "wasn't responding as a normal person would," but he did not know if Adomako was experiencing a mental illness issue, a drug or alcohol issue, or a

3

combination thereof. *Id*. at 166-67. He testified that he had received training on how to interact with individuals with mental illness during a crisis and how to deescalate such situations. *Id*. at 152-54. According to Taylor, he was "trying to be as moderated and calm with [Adomako] as [he] could." *Id*. at 164. At some point, Taylor put his hand on Adomako and asked him to back up because he was too close to Taylor. *Id*. at 168-69.

At the time of the incident, Taylor was 5'11" and weighed 230 pounds. He estimates that Adomako was approximately 6'4" and 200 pounds. Taylor Dep. 130-31. Taylor was dressed in his police uniform and body armor and carried a handgun and a taser. *Id*. at 125-26, 129. According to Taylor, Adomako spoke in a progressively louder and more aggressive tone and "started to tower or lean over [Taylor]," which made Taylor begin to "start fearing for [his] own safety." Taylor Decl. ¶ 9; Taylor Dep. 164-65, 167. Based on his training and experience, Taylor became concerned that Adomako might try to fight with him. Taylor Decl. ¶ 9.

Taylor attempted to place Adomako into a control hold by grabbing his hand. He states that Adomako immediately pulled his hand back. Taylor Decl. ¶ 9. Taylor and Adomako then moved in front of the patrol car into a position where the video camera was able to record their movements. As they enter the frame, the video shows that Taylor grabbed the clothing on Adomako's chest and tried to push him onto the hood of the car, with Adomako's back facing the camera. Video 2:07-2:10.

Taylor testified that he then released Adomako with his right hand as he was trying to "grab another control hold on his left hand, which [Adomako] pull[ed] away from," and then Adomako "immediately flinch[ed] towards [Taylor]." Taylor Dep. 207-08. The video shows that Taylor grabbed Adomako's left wrist. Adomako, with his back still facing the camera, then pulled his arm away from Taylor and moved his entire body to a more upright position in Taylor's direction. Slow Motion Video :49-:56. The two men appear to grapple with each other, although some of their movements are not visible because Adomako had his back towards the camera. Adomako moved forward by pushing on Taylor's chest, forcing Taylor to move back. Holding Taylor near the shoulder area with his left hand, Adomako wound his right arm back and used his open hand to hit Taylor on the shoulder, then immediately aimed a blow at the side of Taylor's

4

head. Taylor ducked, while still holding on to Adomako, and it is not clear whether Adomako's second strike made contact. Slow Motion Video :56-1:14.

At some point during the encounter, Taylor released Cairo from the patrol car. *Id*. at 179-80, 212. Taylor's testimony is unclear as to whether he decided to release Cairo before or after Adomako first struck him. *Compare* Taylor Dep. 180-81 (testifying that Adomako's open-handed blows caused him to release the dog) *with* 209 (answering "yeah" in response to the question "So prior to being struck, you activated your door to release the dog" and stating, "[i]t was when he grabbed me, is what caused me to decide to release the door."). Taylor opened the car door by pressing a button on the remote on his belt. Taylor then gave the command to call his K-9 partner to him. He did not give Cairo the "apprehend" command. *Id*. at 156-57, 181, 209-10.

The video shows that Cairo entered the frame after Adomako attempted to strike Taylor the second time. The dog ran up to Taylor and jumped up on him on his hindlegs. Video 2:10-2:16; Slow Motion Video 1:15-1:21. Taylor testified that Cairo unexpectedly bit Taylor once in the left trapezius area of his arm, breaking his skin. *See id*.; Taylor Dep. 9-10, 22. According to Taylor, he yelled at Cairo, who then let go. *Id*. at 34-35; Video 2:15-:16. Taylor testified that "the dog caused [him] to lose focus on Adomako when he bit [Taylor] initially." Taylor Dep. 196.

The video shows that Adomako and Taylor continued to struggle with each other while Cairo jumped up on his hind legs between the two men and toward Taylor at least three times. Video 2:16-:19; Slow Motion Video 1:22-:35. During this time, Adomako continued to advance on Taylor, and swung five times at Taylor's head with his fist. The first blow made contact with the left side of Taylor's face. Although unclear, it appears that at least one other blow, and possibly two more, made contact with Taylor's head. Video 2:16-:19; Slow Motion Video 1:31-:38. Taylor moved backwards, away from Adomako. Immediately after Adomako's fifth swing, and no more than 13 seconds after the two men first entered the video frame together, Taylor shot Adomako with his firearm. The video does not clearly depict Taylor's operation of the firearm. It shows that as Taylor began to fire, Adomako turned away from Taylor and moved quickly out of the video frame. Video 2:19-:23.

According to Taylor, he fired three shots at Adomako "all right on top of each other," as

fast as he could. Taylor Dep. 190. Taylor testified that he fired his weapon because he "became so incapacitated by the strength of one of [Adomako's] blows" that he thought that he was going to lose consciousness and that Adomako would grab his firearm and kill him. Taylor Dep. 222-24. According to Taylor, he feared that one of Adomako's blows had broken his orbital bone. *Id*. at 223-24.

Around the time that Taylor fired at Adomako, Officer Grant Goepp arrived on the scene. Cairo bit Adomako's leg after he was shot, although Cairo's contact with Adomako is not visible on the video. Taylor Decl. ¶ 10. Taylor instructed the dog to release Adomako, and Goepp handcuffed Adomako. *Id*.; Taylor Dep. 225. Taylor states that within seconds of Goepp's arrival, Taylor reported the use of force and requested immediate medical assistance. He then attempted to help Goepp provide trauma care to Adomako. Paramedics and the Fire Department arrived on scene within minutes of his request. Taylor Decl. ¶ 10; Taylor Dep. 204. Adomako later died from his injuries.

Taylor was treated at a hospital following the incident with complaints of blurry vision, nausea, headache, lightheadedness, and left distal finger pain. Taylor Decl. ¶ 12; Gaches Decl. ¶ 13, Ex. D at ECF pp. 14, 18 (hospital records). The medical records contain two areas which list "final diagnoses." One area indicates "contusion of other part of head, initial encounter" and "displaced fracture of distal phalanx of left little finger, initial encounter for closed fracture." Ex. D at ECF p. 11. The other area indicates "[b]lunt head trauma, facial contusion, finger fracture, left, closed, initial encounter." *Id.* at ECF p. 18. Taylor testified that he suffered a black eye and a broken finger as a result of the incident. Taylor Dep. 21, 197; Douglas Decl., Mar. 25, 2019, ¶ 3, Ex. B13 (photo of black eye).

### B.     Procedural History

Plaintiffs filed this lawsuit on November 1, 2017. The court partially granted Defendants' motion to dismiss, after which Plaintiffs filed the operative complaint on March 26, 2018. [Docket Nos. 25, 32 (Am. Compl.).] On May 16, 2018, the court dismissed Plaintiffs' claim for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). [Docket No. 42.] The remaining claims are: 1) section 1983 claim for unreasonable

6

search and seizure in violation of the Fourth Amendment, by the Estate and Yeboah against Taylor; 2) section 1983 claim for excessive force and denial of medical care in violation of the Fourth Amendment, by the Estate and Yeboah against Taylor; 3) section 1983 claim for interference with Yeboah's right to a familial relationship and freedom of association, based upon the Fourteenth Amendment, by Yeboah against Taylor; 4) false detention, by the Estate against Taylor and Fremont; 6) battery by the Estate against Taylor and Fremont; and 7) negligence by the Estate against Taylor and Fremont.

## II.     LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

### III.    CLAIMS NO LONGER AT ISSUE

Plaintiffs' opposition brief did not address the Estate's section 1983 claims for unlawful detention, unlawful arrest, and denial of medical care; the Estate's state law battery and false detention claims; and Yeboah's section 1983 claim for interference with familial relationship and freedom of association.  Plaintiffs are deemed to have conceded those claims, which are now dismissed with prejudice.  The two remaining claims are the Estate and Yeboah's section 1983 claim for use of excessive force, and the Estate's claim for negligence resulting in wrongful death.

### IV.    DISCUSSION

Defendants move for summary judgment on the section 1983 claim, arguing that there is no genuine dispute of fact as to the reasonableness of Taylor's use of deadly force.  In the alternative, Defendants argue that Taylor is entitled to qualified immunity.  They also move for summary judgment on the negligence claim, arguing that Taylor used reasonable force.

#### A.  Fourth Amendment Claim of Excessive Force

##### 1.    Legal Standard

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989).  Courts analyze claims of excessive force under an "objective reasonableness" standard.  *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 395).  The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. at 396 (citations and internal quotation marks omitted).

Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

When the challenged force is deadly force, it "satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting *Tenn. v. Garner*, 471 U.S. 1, 11 (1985)). The Ninth Circuit has cautioned that in excessive force cases resulting in a death, the trial court must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead." *Long v. City and Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Accordingly, a court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott*, 39 F.3d at 915 (citations omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681

9

F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted).  However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott*, 39 F.3d at 915.

### 2. Analysis

Defendants argue that Taylor's use of deadly force was reasonable under the totality of the circumstances because Adomako was the suspect in a battery, refused to comply with orders, resisted Taylor's efforts to place him in a control hold, and repeatedly struck and punched Taylor in the head, causing him to believe that he was in imminent danger of death or serious physical injury.

To assess the objective reasonableness of Taylor's use of deadly force, the court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and quotation omitted).

### a. Nature and Quality of Intrusion

Taylor shot Adomako three times and killed him, resulting in the highest level of intrusion on Adomako's Fourth Amendment interests. *See Garner*, 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched.").

### b. Governmental Interests at Stake

To determine the governmental interests, the court must examine the non-exhaustive factors set forth in *Graham*.  These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.

### i. Severity of the Crime

The first *Graham* factor examines the severity of the crime.  It is undisputed that Adomako matched the description of the suspect who had committed a battery on a Verizon store employee. It is also undisputed that at the point Taylor shot Adomako, Adomako had also committed battery by repeatedly striking at Taylor, making contact several times with Taylor's shoulder and head.

The second *Graham* factor asks whether the suspect posed an immediate threat to the safety of the officers or others.  It is the "most important" factor.  *See Bryan*, 630 F.3d at 826.  The facts regarding Adomako's actions are undisputed, in large part because Adomako is now deceased and there were no percipient witnesses to the key events other than Taylor.[2]  The record, including the portions of the encounter which were captured on video, does not contradict Defendants' account.  After Adomako refused Taylor's directions to sit down on the curb, Taylor attempted to gain control of him by placing him in a control hold.  The video shows that Adomako pulled away from Taylor's grasp.  In the ensuing struggle, Adomako continually advanced on Taylor, with Taylor moving backwards.  Adomako hit Taylor in the shoulder, and aimed six blows at Taylor's head, connecting at least twice.  During the struggle, Taylor deployed his K-9 partner to assist him in gaining control over Adomako.  Cairo unexpectedly bit Taylor, and Adomako continued to strike Taylor even after Cairo intervened.  Taylor asserts that he shot Adomako because he "became so incapacitated by the strength of one of [Adomako's] blows" that he thought that he was going to lose consciousness and was concerned that Adomako would grab his firearm and kill him.  The medical records tend to corroborate the severity of Adomako's blows; they support that Taylor was treated at a hospital following the incident for complaints of blurry vision, nausea, headache, lightheadedness, and left distal finger pain; and that he was diagnosed at one point with blunt head trauma, facial contusion, and finger fracture.  The physical evidence shows that Taylor sustained a black eye and a broken finger.

Plaintiffs concede that Adomako struck and punched Taylor.  However, they dispute that Taylor reasonably feared for his safety during the altercation.  According to Plaintiffs, no objective evidence justifies Taylor's concern that he might lose consciousness due to being struck by Adomako.  Specifically, they state that the video shows that "Taylor never staggered backwards from any punch," "never fell to the ground," and "never lost consciousness."  They also note that Taylor was able to use his police radio immediately after the shooting.  Opp'n 7.  The court finds

---

[2]  The only facts in the record from witness Alan Arnold pertain to the initial encounter between Taylor and Adomako, described above.  The record does not contain any evidence from Arnold about the ensuing struggle and shooting.

that no reasonable juror could conclude that Taylor lacked a reasonable belief that Adomako posed an immediate threat to his safety, even if the juror determined that Taylor did not stagger from any blow, did not fall or lose consciousness, and was able to operate his equipment right after the encounter.  It is indisputable that Adomako actively resisted all of Taylor's attempts to control him, continued to quickly advance on Taylor, and repeatedly swung at him and made significant physical contact with Taylor's head in the seconds before Taylor shot him, as corroborated by the video and medical records.

Plaintiffs also argue that Taylor was familiar with Adomako and that he had never been violent in their previous interactions.  Accordingly, Plaintiffs contend that Taylor had no objective reason to fear that Adomako would take Taylor's firearm and kill him.  While that may have been true at the beginning of the encounter, it ignores the fact that during the interaction, Adomako repeatedly struck Taylor in the shoulder and head despite Taylor's efforts to control him.  Evidence of Adomako's prior conduct therefore has little bearing on the reasonableness of Taylor's perceptions of the threat that Adomako posed after he began actively assaulting Taylor.

Finally, Plaintiffs argue that the three shots were excessive and unreasonable, because Taylor fired one of the shots at Adomako as he was walking away and no longer posed a threat to Taylor.[3]  Plaintiffs cite two photos in support of this argument: a still photo from the video of the incident and a photo of a bullet wound to Adomako's back.  Douglas Decl. ¶ 3, Exs. B-9, B-10. The still photo from the video shows Taylor standing with his firearm pointed at Adomako and Adomako slightly bending away from Taylor.  It does not show whether Taylor was preparing to fire, in the process of firing, or had completed firing, and therefore does not support the contention that Taylor fired at Adomako as he was walking away.  As for the photograph of the bullet wound in Adomako's back, Plaintiffs offer no evidence to explain the wound and its significance.  For example, there is no evidence in the record about Adomako's position at the time of the wound, the angle of the entrance of the bullet, or even whether what is depicted is an entrance or exit

---

[3] Plaintiffs' argument on this point is confusing.  For example, by asserting that Taylor engaged in excessive force by firing one of the shots as Adomako was walking away (logically, the third and final shot), are Plaintiffs conceding that the first two shots were not excessive?  The court construes Plaintiffs' argument as bearing on the "imminent threat" prong of the *Graham* test.

wound.

Taylor testified that he fired three shots in rapid succession "all right on top of each other." The video shows that Adomako continued to attack Taylor up to the moment that Taylor lifted his firearm and began to fire, at which point Adomako began to turn his shoulder and run away from Taylor, disappearing out of camera view. The three shots are not separately discernable; however, all three shots took place within two seconds on the video counter. Plaintiffs offer no evidence to dispute that Taylor fired the three shots rapidly, beginning at a point when he was under attack, and without pausing between shots. Plaintiffs' evidence is insufficient to create a genuine dispute of fact as to whether Taylor fired any shots as Adomako was "walking away and no longer posed a threat."

### iii.  Active Resistance

The Ninth Circuit has explained that "[r]esistance . . . should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830.

It is undisputed that Adomako actively resisted Taylor's efforts to gain control over him. After refusing Taylor's requests to sit on the curb, Adomako resisted Taylor's efforts to place him in a control hold. From there, the situation rapidly escalated to Adomako actively striking and attempting to strike Taylor in the head, up until the moment Taylor shot him.

### iv.  Other Considerations

Plaintiffs argue that other factors weigh in favor of finding Taylor's use of deadly force unreasonable. First, they argue that Taylor was required to consider less intrusive means of forcing Adomako into compliance before using deadly force, citing *Bryan*. In *Bryan*, the Ninth Circuit held that an officer's use of a taser on an arrestee following a routine traffic stop constituted excessive force where the arrestee was shouting expletives and gibberish, but was unarmed, did not pose an immediate threat to the officer or to bystanders, and stood 20 feet from the officer, facing away from him. 630 F.3d at 831-32. The court held that the officer's failure to consider less intrusive means of effecting the arrest was a factor to consider in the *Graham*

analysis. However, the court also noted that it did not "challenge the settled principle that police officers need not employ the 'least intrusive' degree of force possible," and instead recognized "the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include" in the analysis." *Id*. at 831 n.15 (emphases in original).

The undisputed evidence shows that Taylor considered and attempted to use a less intrusive means to control Adomako, namely, his K-9 partner. This was unsuccessful, as Cairo unexpectedly attacked Taylor. The video shows that Cairo's presence did not deter Adomako from continuing to attack Taylor. Plaintiffs concede this, asserting that "[t]here was no objective change in Adomako's level of active resistance" after the deployment of the K-9.[4] Opp'n 8.

Plaintiffs also argue that Taylor should have considered Adomako's mental condition in determining his response to the situation. In *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001), the Ninth Circuit observed that that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." The court noted that it was not "adopt[ing] a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals," but was instead "emphasiz[ing] that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Id*. at 1283.

Here, Taylor testified that he suspected that Adomako might have mental health issues based on their prior interactions. Additionally, Adomako made irrational, bizarre statements to Taylor at the beginning of their encounter, such as, "I am the king of Fremont. I am the chief of police." Taylor testified that he was unsure whether Adomako was experiencing a mental health

---

[4] Plaintiffs stated at the hearing that they do not contend that Cairo was negligently trained by Fremont or Taylor, or that Taylor negligently deployed the K-9 during the confrontation. [Docket No. 81 (Hr'g Tr., Apr. 25, 2019) at 5.]

crisis or was under the influence of drugs or alcohol, and that he tried to be "as moderated and calm" as possible with Adomako. There is no evidence that Taylor failed to take Adomako's possible mental health issues into account. Moreover, unlike the suspect in *Deorle*, Adomako was not "an unarmed, emotionally distraught individual who [was] creating a disturbance" at the time of the shooting. By the time Taylor shot Adomako, Adomako had already repeatedly assaulted Taylor on the shoulder and head, caused injury, and was continuing to advance on him. *Compare Deorle*, 272 F.3d at 1275, 1282 (concluding that use of lead-filed beanbag round against unarmed, emotionally disturbed suspect was not objectively reasonable where suspect had complied with officers' commands, had not "attacked or even touched anyone," and had not committed a serious offense but instead had "essentially disturb[ed] the peace").

### c. Weighing the Intrusion on Adomako's Fourth Amendment Interests Against the *Graham* Factors

To assess the objective reasonableness of Taylor's use of deadly force, the court must balance "the nature and quality of the intrusion on [Adomako's] Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and quotation omitted). Having carefully considered all of the evidence in the record, the court concludes that there are no genuine disputes of material fact regarding the events leading up to Adomako's shooting. Accordingly, the reasonableness of Taylor's actions is a question of law. *See Scott*, 550 U.S. at 381 n.8.

The court is mindful that "[a]ll determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Scott*, 39 F.3d at 914 (quoting *Graham,* 490 U.S. at 396-97)). Further, "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012).

In this case, at a basic level, the court must determine whether it is reasonable to use deadly force where the officer attempts to detain a suspect in connection with a reported battery,

and the suspect resists the officer's attempts to control him, repeatedly slaps and punches his head and shoulder with enough force to cause a black eye, and continues to attack him after deployment of a K-9. However, layered on top of this is a complexity. The circumstances here are unique because Taylor shot Adomako after the deployment of Cairo failed to go as expected. Instead of assisting in controlling Adomako, Cairo attacked Taylor. Cairo then continued to jump up on his hind legs several times between the two men while facing Taylor and appearing to lunge at him. Viewing the video in the light most favorable to Plaintiffs, a juror could determine that Adomako's first blow to Taylor's head occurred soon after Cairo bit Taylor and was the result of Cairo having distracted Taylor. This created an opening for Adomako to land a solid punch and gain the advantage in the struggle. After that, Cairo continued to jump up in Taylor's direction as Adomako continued to attack him. A reasonable jury could conclude that Cairo's actions materially increased the danger that Taylor faced, and led to Taylor's use of deadly force.

The parties did not brief this complexity, and the court found no case analyzing the use of force when actions by a K-9 officer enhance the imminent threat to an officer's safety. However, Ninth Circuit law suggests that Cairo's actions do not bear on the constitutional analysis regarding the reasonableness of Taylor's subsequent use of force. This is because an officer's "negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation," even if the negligence "provokes a violent response." *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002) (emphasis removed), *abrogated on other grounds by Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). Instead, the court must look solely at whether Taylor's use of force was objectively reasonable in light of the facts and circumstances confronting him at the time he used the force. *See Graham*, 490 U.S. at 396. The reasonableness must be judged from the perspective of an officer at the scene.

Given that "officers are not required to use the least intrusive degree of force possible," *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc) (quotation omitted), the court concludes that the undisputed evidence, viewed in the light most favorable to Plaintiffs, shows that Taylor's use of deadly force was objectively reasonable at the moment that he shot Adomako. Accordingly, the court grants summary judgment on Plaintiffs' excessive force claim.

16

### 3. Qualified Immunity

Even if triable issues existed as to the reasonableness of Taylor's use of deadly force, Taylor would be entitled to summary judgment on the Estate's excessive force claim based on qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id*. The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe Cty*., 663 F.3d 1071, 1075 (9th Cir. 2011) (citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has cautioned that specificity in determining whether "the violative nature of *particular* conduct is clearly established . . . is especially important in the Fourth Amendment

context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (quotation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309). While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Finally, "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

Defendants argue that Taylor is entitled to qualified immunity because this case presents a unique set of facts in that Taylor was being physically attacked by a suspect and a less intrusive means to subdue the suspect (the K-9) had failed to perform as expected when he used deadly force on Adomako. They argue that Plaintiffs cannot show that the law was clearly established that an officer confronting the situation Taylor faced was prohibited from using deadly force to protect him or herself from attack.

The court agrees. In their brief, Defendants cite recent Supreme Court and Ninth Circuit authority emphasizing that courts must not "define clearly established law at a high level of generality" for purposes of the qualified immunity analysis. *See* Mot. 17-20 (citing *Kisela*; *Reese v. Cty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018); *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019); *Mullenix*). In opposition, Plaintiffs merely distinguish the facts of *Kisela* and *Emmons* from the facts in this case. *See* Opp'n 9-11. This falls far short of satisfying their burden to identify authority that would have put Taylor on notice that his use of deadly force was unreasonable.

The only case Plaintiffs cite, *Uwumarogie v. Village of Glen Ellyn*, No. 06 C 2628, 2008 WL 2782833 (N.D. Ill. Jul. 15, 2008), involves facts that are readily distinguishable from the

circumstances here. Plaintiffs may not rely on a single, distinguishable, unpublished, out-of-circuit trial level decision as clearly established law for purposes of qualified immunity. *See Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) (holding that while unpublished district court decisions "may inform our qualified immunity analysis," a right is rarely clearly established "absent any published opinions on point or overwhelming obviousness of illegality.").

In the absence of clearly established law prohibiting Taylor from using deadly force in these circumstances, Taylor is entitled to qualified immunity.

### B.     Negligence Claim

The Estate's remaining claim is for negligence resulting in Adomako's wrongful death. In order to prevail on a negligence claim, the Estate must establish "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cty. of San Mateo*, 12 Cal.4th 913, 917 (1996)). In *Hayes v. County of San Diego*, 57 Cal. 4th 622, 639 (2013), the California Supreme Court held that an officer's "tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." Under California law, "peace officers have a duty to act reasonably when using deadly force, a duty that extends to the totality of the circumstances surrounding the shooting, including the officers' preshooting conduct." *Id.* at 638.

"Thus, negligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment." *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016). Judge Friedland recently explained the distinction between federal and state law in her concurring opinion in *J.A.L. v. Santos*, 724 Fed. Appx. 531 (9th Cir. 2018), and concluded that the distinction should have driven a different result in light of the particular facts of that case:

> Under federal law, 'even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.' *Billington*, 292 F.3d at 1190 (emphasis omitted). I agree that [it is beyond dispute that at the moment of the shooting, the officer] had probable cause to believe Lopez posed 'a significant threat of death or serious physical injury to' Officer Van der Hoek,

> *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). I therefore agree that the district court properly granted summary judgment in favor of the officers on J.L.'s Fourth Amendment claim.
>
> But California law is different, and in my view that difference should have precluded summary judgment on J.L.'s negligence claim. Under California law, unlike under federal law, what officers do before shooting can 'show that an otherwise reasonable use of deadly force was in fact unreasonable.' *Hayes*, 57 Cal. 4th at 630. This means that 'tactical conduct and decisions preceding the use of deadly force' may 'give[ ] rise to negligence liability' if they 'show, as part of the totality of circumstances, that the use of deadly force was unreasonable.' *Id.* at 626. Construing the record in the light most favorable to J.L., a reasonable jury could find that the officers precipitated the need for deadly force, and that the officers' use of deadly force was unreasonable under California law as a result. J.L.'s negligence claim should therefore have made it to trial.

724 Fed. Appx. at 534-35 (Friedland, J., concurring).

As with excessive force claims brought under the Fourth Amendment, California law evaluates the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes*, 57 Cal. 4th at 632 (quoting *Graham*, 490 U.S. at 396). *Hayes* cautions that in cases "where the preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable." *Id.*

The Estate's articulation of its negligence claim has been a moving target. As previously noted, the Estate does not contend that Cairo was negligently trained, or that Taylor negligently deployed him. At the hearing, Plaintiff asserted that its negligence theory is based on Taylor's reaction to Cairo's actions; namely, that Cairo's unexpected attack on Taylor created a duty on Taylor's part to retreat and gain control of the dog before re-engaging with Adomako. This argument was not briefed or explained in any detail in Plaintiffs' opposition brief. Therefore, following the hearing, the court ordered the parties to submit supplemental briefing on this issue, which the parties timely filed. [Docket Nos. 74, 79 (Pls.' Br.), 80 (Defs.' Br.).]

In its supplemental brief, the Estate makes a slightly different argument: that Taylor "was so overwhelmed by his interaction with Adomako and the attack from Cairo that he unreasonably

20

increased his use of force to that of deadly force against Adomako, who maintained a persistent threat level without increasing." Pls.' Br. 2. According to the Estate, Taylor unreasonably viewed "Adomako as a more significant threat to his life" based on Taylor's "confusion, combined with the pain from the dog's attacks." It argues that a reasonable officer in the same situation "would have tried to separate himself from the situation to regain his 'focus', issue commands directing Cairo to disengage and continue with his efforts to detain Adomako." *Id.* The Estate does not cite any authority to support its position that Taylor's duty to act reasonably required him to retreat and gain control of Cairo while Adomako continued to attack him.

Defendants argue that under California law, Taylor had no duty to retreat in carrying out his obligation to use reasonable force. Defendants cite California Penal Code section 835a:

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.
>
> *A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested*; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

Cal. Penal Code § 835a (emphasis added).[5]

Section 835a does not squarely address the Estate's theory. According to the Estate, Taylor should have pulled back, not "by reason of the resistance or threatened resistance" of Adomako, but due to the fact that Cairo's intervention created additional danger, permitting Adomako to get the upper hand on Taylor, which led to Taylor's use of deadly force.

Under *Hayes*, in deciding whether Taylor acted reasonably in using deadly force, the jury may consider preshooting conduct, including Cairo's effect on the circumstances that led to the shooting. Viewing the undisputed facts in the light most favorable to the Estate, as previously noted, a juror could determine that Cairo distracted Taylor and created the opening for Adomako

---

[5] Defendants also cite two cases, but both are factually distinguishable and have no material bearing on this issue other than as citations to the general "no duty to retreat" rule set forth in section 835a. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516 (2009) and *Lopez v. City of Los Angeles*, 196 Cal. App. 4th 675 (2011) (citing *Brown*).

21

to land a hard blow to Taylor's face and gain the advantage in the fight. Cairo's continued actions interfered in Taylor's ability to control the situation. A reasonable jury could conclude that Cairo's actions materially increased the danger that Taylor faced, and led to Taylor's use of deadly force. Although the court believes it unlikely, it cannot rule out that a reasonable juror could find that Taylor acted negligently in shooting Adomako under those circumstances.

Finally, Defendants argue that Taylor is entitled to immunity under California Government Code section 820.2, which provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." In *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1083-84 (9th Cir. 2018), the Ninth Circuit rejected a similar claim, noting that "the California Supreme Court has held that this immunity applies only to policy decisions, not to operational decisions like the decision to enter the [plaintiffs'] residence here." (citing *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995)); *see also Sharp v. Cty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (holding that section 820.2 immunity "covers only 'policy' decisions made by a 'coordinate branch[ ] of government,' not 'operational decision[s] by the police purporting to apply the law.'" (quotation omitted)).

Therefore, the court denies summary judgment on the Estate's negligence claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: June 21, 2019



Donna M. Ryu
United States Magistrate Judge